Argued and submitted April 19, resubmitted May 27; decision of the Court of Appeals and judgment of the district court affirmed September 9, 1994

## STATE OF OREGON,
*Respondent on Review,*

*v.*

## JEFFREY DEAN NAGEL,
*Petitioner on Review.*

## (DC 91-3459; CA A76823; SC S40605)

880 P2d 451

In Banc

James N. Varner, Deputy Public Defender, Salem, argued the cause for petitioner on review. With him on the petition and a response to the court's questions was Sally L. Avera, Public Defender.

Jonathan H. Fussner, Assistant Attorney General, Salem, argued the cause for respondent on review. With him on the response to the court's questions were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General.

CARSON, C. J.

Unis, J., concurred and filed an opinion.

Gillette, J., concurred in part and specially concurred in part and filed an opinion in which Graber, J., joined.

Van Hoomissen, J., concurred in part and specially concurred in part and filed an opinion.

Graber, J., specially concurred and filed an opinion in which Gillette, J., joined.

## CARSON, C. J.

The central issue in this case is whether the administration of field sobriety tests violated defendant's right to be free from unreasonable searches and seizures under Article I, section 9, of the Oregon Constitution, and the Fourth Amendment to the Constitution of the United States.

The following statement of facts is uncontroverted. In August 1991, at a time of day when headlights were required by law to be illuminated, a Lincoln County Deputy Sheriff saw defendant driving his automobile on a public road, with only one headlight illuminated. The officer turned his automobile around and put on his overhead lights. Defendant immediately pulled his automobile to the side of the road. The officer testified at the suppression hearing that, when he asked defendant for his driver license, he noticed that defendant's breath smelled strongly of alcohol and that defendant's eyes were "very bloodshot and glassy." The officer also testified that defendant had difficulty removing his license from his wallet, even though the license was clearly visible to the officer. The officer asked defendant how much he had had to drink. Defendant responded, "none."

The officer testified that he then told defendant that he wanted to administer field sobriety tests. He asked defendant to get out of his automobile, and he read defendant the statutory consequences for refusing to perform field sobriety tests.[1] *See* ORS 813.136 (if a person refuses or fails to submit to field sobriety tests as required by ORS 813.135, evidence of the refusal is admissible in any proceeding arising from allegations that the person was driving while intoxicated).

The officer had defendant perform the following five field sobriety tests. First, the officer asked defendant to recite the alphabet from A to Z. After stopping once and starting over, defendant satisfactorily completed that test. Second, the officer asked defendant to count backward from 107 to 87. Defendant started over twice but never completed that test. Third, the officer asked defendant to stand on one leg with

---

[1] The officer told defendant: "I am now going to request you to perform field sobriety tests. If you refuse, or fail to submit to the field sobriety tests, evidence of the refusal or failure is admissible in any criminal or civil action or proceeding arising out of the allegation that you were driving under the influence of intoxicants."

either foot about six inches off the ground. The officer asked defendant to count, with his leg still off the ground, from 1001 to 1030. Defendant started the test three times and never completed the test, stating that he was unable to complete it. Fourth, the officer asked defendant to walk in a straight line, touching heel to toe, for nine steps, and then to turn around and walk back the same way. Defendant did not touch heel to toe on any of the steps. Finally, the officer performed the "Horizontal Gaze Nystagmus" test, which the officer did not describe in his testimony.[2] The officer testified that he had conducted the field sobriety tests to "[t]est [defendant's] coordination, his hand-eye coordination, his memory, [and] his ability to [perform] divided attention tests."

After defendant completed the field sobriety tests, the officer arrested defendant for driving under the influence of intoxicants (DUII).[3] The officer testified that he would have arrested defendant for DUII even if defendant had refused to submit to the field sobriety tests.

Before trial, defendant moved to suppress all evidence derived from the field sobriety tests, arguing that the tests violated his right to be free from unreasonable searches and seizures under Article I, section 9, of the Oregon Constitution, and the Fourth Amendment to the Constitution of the United States.[4]

_____

[2] In its findings, the trial court stated, "the horizontal gaze nystagmus test * * * is disregarded by the Court." Accordingly, we do not consider that test in our analysis.

[3] ORS 813.010 provides, in part:

"(1) A person commits the offense of driving while under the influence of intoxicants if the person drives a vehicle while the person:

"(a) Has .08 percent or more by weight of alcohol in the blood of the person as shown by chemical analysis of the breath or blood of the person * * *.

"(b) Is under the influence of intoxicating liquor or a controlled substance; or

"(c) Is under the influence of intoxicating liquor and a controlled substance.

"* * * * *

"(4) The offense described in this section, driving while under the influence of intoxicants, is a Class A misdemeanor and is applicable upon any premises open to the public."

[4] Defendant also moved to suppress the results of the tests on the ground that the field sobriety tests were obtained in violation of his privilege against self-incrimination under Article I, section 12, of the Oregon Constitution, and the Fifth

The trial court denied defendant's motion to suppress. After a trial to the court on stipulated facts, the trial court found defendant guilty of DUII and sentenced him to three years probation with several general and specific conditions. Defendant appealed his conviction to the Court of Appeals. The Court of Appeals affirmed defendant's conviction from the bench without opinion. *State v. Nagel*, 122 Or App 638, 858 P2d 181 (1993).

We allowed defendant's petition for review and affirm the decision of the Court of Appeals.

We first turn to defendant's argument that the administration of field sobriety tests violated his right to be free from unreasonable searches and seizures under Article I, section 9, of the Oregon Constitution. *See State v. Rodriguez*, 317 Or 27, 32, 854 P2d 399 (1993) ("Before addressing defendant's claims under the federal constitution, we address defendant's claims under the state constitution."). Article I, section 9, of the Oregon Constitution, provides:

> "No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

■ In conducting an Article I, section 9, inquiry, we first ask whether the police conduct at issue was a search or a seizure. Article I, section 9, protects the people from unreasonable search or seizure. If the police conduct at issue was not a search or a seizure, the constitutional protection does not apply, and it is of no moment that the conduct was "reasonable." We will not scrutinize police conduct for a factual justification, *i.e.*, determine whether the conduct was "reasonable," unless we first have determined that the conduct is covered by Article I, section 9. As this court has stated:

> "[Article I, section 9,] does not protect citizens from all forms of governmental observation, but only from unreasonable 'searches' (and seizures). It follows, therefore, that *the threshold question in any Article I, section 9, search analysis*

Amendment to the Constitution of the United States. Defendant does not raise that argument here; thus, we do not discuss it.

*is whether the police conduct at issue is sufficiently intrusive to be classified as a search." State v. Ainsworth,* 310 Or 613, 616, 801 P2d 749 (1990). (Emphasis added.)

*See also State v. Wacker,* 317 Or 419, 426, 856 P2d 1029 (1993) ("If the police conduct is not a search within the meaning of Article I, section 9, this court will not reach the issue of whether the conduct was unreasonable.").

Under Article I, section 9, a search is "an intrusion by a governmental officer, agent, or employee into the protected privacy interest of an individual." *State v. Rhodes,* 315 Or 191, 196, 843 P2d 927 (1992). Unlike under the federal constitution, a search is not defined by a reasonable expectation of privacy, but in terms of "the privacy to which one has a *right." State v. Campbell,* 306 Or 157, 164, 759 P2d 1040 (1988). (Emphasis in original.)

■ In order to determine whether particular police conduct constitutes a search, "we must look to the nature of the act asserted to be a search." *Id.* at 170. The test to determine whether police conduct rises to the level of a search is "whether the government's conduct 'would significantly impair an individual's interest in freedom from scrutiny, *i.e.,* his privacy.' " *State v. Wacker, supra,* 317 Or at 425 (quoting *State v. Dixon/Digby,* 307 Or 195, 211, 766 P2d 1015 (1988)). We must decide "whether the practice, if engaged in wholly at the discretion of the government, will significantly impair 'the people's' freedom from scrutiny." *State v. Campbell, supra,* 306 Or at 171.

This court's decision in *Campbell* is instructive in this case. In that case, the police attached a radio transmitter to the defendant's automobile and followed the movements of defendant's automobile both by a ground-based receiver and by an airplane. *Id.* at 160-61. The court held that the use of the radio transmitter to follow the movements of the defendant's automobile was a search under Article I, section 9. *Id.* at 172. In that case, the state argued that the defendant did not have a right of privacy in the movements of his automobile because his automobile was in places open to public view. *Id.* at 165. This court rejected that argument, stating that "[w]hether police conduct is a search does not turn on whether its object could be discovered by conduct that is not a search." *Id.* at 167. The court focused on whether the police

conduct was sufficiently intrusive to "significantly impair 'the people's' freedom from scrutiny." *Id.* at 171. The court held that the "use of a radio transmitter to locate an object to which the transmitter is attached cannot be equated with visual tracking." *Id.* at 171-72.

In this case, the officer directed defendant to recite the alphabet from A to Z. The officer next directed defendant to count backward from 107 to 87. The officer also instructed defendant to stand on one leg with his foot about six inches off the ground while counting from 1001 to 1030. Finally, the officer required defendant to walk in a straight line, touching heel to toe, for nine steps, and then to turn around and walk back the same way.

By requiring defendant to perform a series of unusual maneuvers and acts, the officer was able to detect certain aspects of defendant's physical and psychological condition that were not detectable through simple observation by any member of the public or by a police officer located in a public place.[5] As with the use of the radio transmitter, the officer in this case created an unusual situation in which he could obtain evidence that was not otherwise subject to scrutiny either by a police officer or by private individuals.

*State v. Rhodes, supra,* also is helpful in deciding this case. In that case, this court held that a police officer conducted a search when he opened the door of the defendant's automobile from three to four inches to completely open and looked inside the passenger compartment. 315 Or at 196-97. The court held that, by opening the automobile door further and looking inside, the police officer exposed

> "the inside of the passenger compartment to a visual inspection of a scope and intensity that * * * could not have been made without opening the door. In other words, [the police officer's] actions permitted him to observe or smell what he

---

[5] In *State v. Campbell*, 306 Or 157, 170, 759 P2d 1040 (1988), this court stated:

"One explanation for the absence of a constitutionally protected interest against certain forms of government scrutiny may be the absence of any freedom from those forms of scrutiny in society at large. The reason that the observations of a police officer who is standing in a public place infringe no privacy interest may be that there is no generally recognized freedom from such scrutiny by private individuals."

otherwise could not have seen or smelled from a lawful vantage point. That was a search." *Id.* at 197.

As in *Rhodes*, the officer in this case created a situation in which he could observe certain aspects of the defendant's physical and psychological condition that he was otherwise unable to observe. In this case, the police officer directed defendant to perform a series of field sobriety tests and then guided defendant through each step of the tests. At each point during the tests, the officer told defendant what act to perform and defendant complied while the officer observed defendant perform the acts. The officer instructed defendant to perform a series of specialized and unusual acts designed to elicit information that defendant would not have exposed to the public without the officer's direction.

■    The officer created a situation that exposed information about defendant that was otherwise not observable by either the officer or by members of the general public and was, thus, private. Certainly, "the people's" interest in keeping certain aspects of their physical, mental, and psychological condition private is as significant as their interest in keeping the contents of their automobiles private. *See State v. Campbell, supra*, 306 Or at 171 (setting forth standard). We conclude that the administration of such tests here constitutes a search within the meaning of Article I, section 9.

■    We now must determine whether the search was reasonable under Article I, section 9. This court has held:

"Normally, in order for a search to be constitutionally permissible, the police must have a search warrant. * * *

"A warrantless search by the police is 'reasonable' under Article I, section 9, when the search falls into one or another of the recognized exceptions to the warrant requirement." *State v. Paulson*, 313 Or 346, 351, 833 P2d 1278 (1992). (Citations omitted.)

■■    In this case, the officer did not have a warrant to conduct field sobriety tests. Thus, in order for the search to be reasonable, the administration of the field sobriety tests must fall into one of the recognized exceptions to the warrant requirement.[6] One of those exceptions is a search conducted

---

[6] The state has the burden to establish by a preponderance of the evidence that the search is reasonable under an exception to the warrant requirement. *Cf. State v.*

with probable cause and under exigent circumstances. *State v. Moylett*, 313 Or 540, 548, 836 P2d 1329 (1992).

Under Article I, section 9, there are two components to probable cause: "An officer must subjectively believe that a crime has been committed and thus that a person or thing is subject to seizure [or search], and this belief must be objectively reasonable in the circumstances." *State v. Owens*, 302 Or 196, 204, 729 P2d 524 (1986). Defendant argues that the trial court did not state sufficient findings and conclusions that subjective and objective probable cause existed *before* the officer administered the field sobriety tests. We disagree.

The officer testified at the suppression hearing that he would have arrested defendant for DUII even if defendant had not submitted to the field sobriety tests. In its order denying defendant's motion to suppress, the trial court found: "If the [d]efendant had refused to perform the tests, [the officer] testified that he would have arrested the [d]efendant anyway, based on his observations exclusive of those tests." The court also found that the officer "implied that he already had the subjective belief that the [d]efendant was under the influence of intoxicants, *i.e.*, that he had probable cause to arrest." Those statements by the trial court are sufficient to show that the court found that the officer *subjectively believed* that he had probable cause before he administered the field sobriety tests. That finding of historical fact is supported by evidence in the record, and we are bound by it. *State v. Stevens*, 311 Or 119, 126, 806 P2d 92 (1991) ("In evaluating whether * * * warrantless searches [are] justified, we are bound by the trial court's findings of historical fact if evidence supports them.").

The trial court also concluded that the officer's subjective belief that there was probable cause was objectively reasonable. The court stated:

"The discussion of [the foregoing case law] has been included to explain this Court's finding that [the officer] did have probable cause to arrest the [d]efendant prior to asking that the field sobriety tests be performed, notwithstanding [the

---

*Miller*, 269 Or 328, 334, 524 P2d 1399 (1974) (applied that standard under the Fourth Amendment).

officer's] delay in making the actual decision to arrest. His testimony and common sense both support that conclusion."

If the trial court's findings of fact are supported by the record, we are limited to determining whether the legal principles were correctly applied. *State v. Stevens, supra,* 311 Or at 126. As the basis for its conclusion, the trial court found as fact that the officer "detected an odor of alcohol and noted several indicia of intoxication." The court also found that defendant "failed to locate his driver's license in his wallet, while that document was quite visible to [the officer] while watching the [d]efendant attempt to find it." Those findings were supported by the officer's testimony at the suppression hearing.

Thus, we are limited to determining whether the legal principles were correctly applied to those facts. Based on the trial court's findings of fact, we conclude that the trial court correctly applied the law and that the officer's subjective belief that there was probable cause was objectively reasonable.

■    We also conclude that there were exigent circumstances justifying the administration of field sobriety tests. This court has held that an exigent circumstance "is a situation that requires the police to act swiftly to prevent danger to life or serious damage to property, or to forestall a suspect's escape or the destruction of evidence." *State v. Stevens, supra,* 311 Or at 126. Blood-alcohol content is a transitory condition, the evidence of which will dissipate in a relatively short time. *See State v. Milligan,* 304 Or 659, 666-67, 748 P2d 130 (1988) (warrantless blood-alcohol test was reasonable because it was based on probable cause and exigent circumstances); *cf. State v. Parker,* 317 Or 225, 232 n 9, 855 P2d 636 (1993) (state need not call an expert on the dissipation of blood-alcohol content because the fact that blood-alcohol dissipates over time is common knowledge). In this case, the evidence of defendant's intoxication may have dissipated if the officer had taken the time to leave the roadside and obtain a warrant for the search. Thus, the warrantless administration of field sobriety tests was reasonable under Article I, section 9, because it was based upon probable cause and was conducted under exigent circumstances. We hold that defendant's Article I, section 9, right to be free from unreasonable searches and seizures was not violated.

■ We now turn to defendant's argument that his Fourth Amendment right to be free from unreasonable searches and seizures was violated. The Fourth Amendment provides:

> "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrant shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

■ Again, we first must decide if the police conduct at issue was a search under the Fourth Amendment. Unlike under Article I, section 9, a search governed by the Fourth Amendment is defined by whether an individual has a "reasonable expectation of privacy." *Terry v. Ohio*, 392 US 1, 9, 88 S Ct 1868, 20 L Ed 2d 889 (1968). As the Supreme Court of the United States has formulated it, "wherever an individual may harbor a reasonable 'expectation of privacy,' * * * he is entitled to be free from unreasonable governmental intrusion." *Terry v. Ohio, supra*, 392 US at 9. (Citation omitted.)

The state argues that, because defendant was driving in public and because the field sobriety tests took place alongside a public road, defendant did not have a reasonable expectation of privacy in the evidence sought by the field sobriety tests. That argument is not convincing. In *Katz v. United States*, 389 US 347, 351-52, 88 S Ct 507, 19 L Ed 2d 576 (1967), the Supreme Court of the United States held:

> "[T]he Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. * * * But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." (Citations omitted.)

There are at least two reasons why the field sobriety tests administered in this case are counter to a reasonable expectation of privacy. First, the tests require defendant to perform certain maneuvers that are not regularly performed in public. Unlike the quality of one's voice or one's handwriting, people do not regularly display that type of behavior to the public — there is no reason to believe that motorists regularly stand alongside a public road reciting the alphabet;

count backward from 107; stand upon one leg while counting from 1001 to 1030; or walk a line, forward and back, counting steps and touching heel to toe.[7] *Compare United States v. Dionisio*, 410 US 1, 14, 93 S Ct 764, 35 L Ed 2d 67 (1972) (no expectation of privacy in a voice exemplar because a person's "voice is repeatedly produced for others to hear") *with Skinner v. Railway Labor Executives' Assn.*, 489 US 602, 617, 109 S Ct 1402, 103 L Ed 2d 639 (1989) (person has expectation of privacy in urine testing because urinating ordinarily is not done in public).

The United States Supreme Court's decision in *Arizona v. Hicks*, 480 US 321, 107 S Ct 1149, 94 L Ed 2d 347 (1987), also is instructive. In that case, police officers entered an apartment after a bullet was fired through the floor. 480 US at 323. The original entry into the apartment was reasonable based upon probable cause and exigent circumstances. *Id.* at 324. While the police were in the apartment, one officer noticed some stereo equipment that seemed out of place. *Id.* at 323. He moved some of the equipment in order to observe and record its serial numbers. *Id.* The Court held that the police officer had conducted a search, because moving the stereo equipment, "which exposed to view concealed portions of the apartment or its contents, did produce a new invasion of respondent's privacy." *Id.* at 325.

In a similar way, field sobriety tests expose to police view things that are not obvious through passive observation of the suspected person. In this case, the officer required defendant to perform certain acts that exposed otherwise concealed information about defendant, constituting an invasion of defendant's privacy. *Cf. Minnesota v. Dickerson*, ____

---

[7] The Supreme Court of Colorado summarized:

"A roadside sobriety test involves an examination and evaluation of a person's ability to perform a series of coordinative physical maneuvers, not normally performed in public or knowingly exposed to public viewing, for the purpose of determining whether the person under observation is intoxicated.

"* * * * *

"Indeed, in some respects, roadside sobriety testing might be considered more invasive of privacy interests than chemical testing. The latter is usually performed in the relatively obscure setting of a station house or hospital, while roadside sobriety testing will often take place on or near a public street with the suspect exposed to the full view of motorists, pedestrians, or anyone else who happens to be in the area." *People v. Carlson*, 677 P2d 310, 316-17 (Colo 1984).

US ___, 113 S Ct 2130, 2138, 124 L Ed 2d 334 (1993) (privacy interest implicated when, during a patdown search, officer relied on sense of touch to find contraband even after determining that the container found on defendant did not hold a weapon).

Secondly, defendant has a reasonable expectation of privacy in the *information* that the officer obtained through the field sobriety tests. Field sobriety tests seek to elicit evidence of a person's coordination, psychological condition, and physical capabilities. The Supreme Court has held that urine testing is a search under the Fourth Amendment, not only because of the intrusive collection process, but also because of the nature of the information revealed by testing the sample. *Skinner v. Railway Labor Executives' Assn., supra,* 489 US at 617. In that case, the Court stated: "[C]hemical analysis of urine, like that of blood, can reveal a host of private medical facts about an employee, including whether he or she is epileptic, pregnant, or diabetic." *Id.* In the same way, a field sobriety test may reveal evidence of equally private facts about an individual, including whether the individual is illiterate, has Alzheimer's disease, or suffers from multiple sclerosis. As the Supreme Court recognized in *Skinner,* defendant has a reasonable expectation of privacy in that type of information. Accordingly, there are constitutionally protected privacy interests implicated both in the process of conducting field sobriety tests and in the information disclosed by the tests — the administration of field sobriety tests constitutes a search under the Fourth Amendment to the United States Constitution.

■ "[S]earches and seizures ' "conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment — subject only to a few specifically established and well delineated exceptions." ' " *Minnesota v. Dickerson, supra,* 113 S Ct at 2135. (Citations omitted.) Although the officer here did not have a search warrant to conduct the field sobriety tests, the search nonetheless was reasonable under the Fourth Amendment for the same reason that it was reasonable under Article I, section 9. In *State v. Milligan, supra,* this court held that a blood-alcohol test was reasonable under the Fourth Amendment, because it was based upon

probable cause and because it occurred under exigent circumstances. 304 Or at 668-69. This court also concluded in *Milligan* that, in conducting a blood-alcohol test, "it is the evanescent nature of the evidence sought" that justifies the search "so long as the extraction is based on probable cause sufficiently strong to have justified * * * an arrest." *See also Cupp v. Murphy*, 412 US 291, 296, 93 S Ct 2000, 36 L Ed 2d 900 (1973) (search of defendant's fingernails was justified by probable cause and exigency created by destructibility of evidence); *Schmerber v. California*, 384 US 757, 770-71, 86 S Ct 1826, 16 L Ed 2d 908 (1966) (blood-alcohol test was justified because defendant had been arrested upon probable cause and evidence of blood alcohol was evanescent). For the reasons explained above, there was probable cause to arrest defendant for DUII, and the evidence of impairment resulting from blood alcohol was by nature evanescent. Accordingly, the warrantless administration of the field sobriety tests was reasonable under the Fourth Amendment.

Because the field sobriety tests in this case were administered upon probable cause and under exigent circumstances and, therefore, were reasonable, we do not reach defendant's argument that the statutory scheme authorizing field sobriety tests set forth in ORS 813.135 and 813.136 unconstitutionally authorizes field sobriety tests upon less than probable cause.

The decision of the Court of Appeals is affirmed. The judgment of the district court is affirmed.

**UNIS, J.,** concurring.

I agree completely with both the analysis and the result of the court's opinion. I write separately only to emphasize why the approach taken by the court is correct, as opposed to the approach advocated by Justices Gillette and Graber in their separate opinions.

Justices Gillette and Graber suggest that the court's holding that the administration of field sobriety tests constitutes a search under Article I, section 9, of the Oregon Constitution is *dictum*. Justices Gillette and Graber also contend that a better approach would be to decide this case by assuming that the field sobriety tests are a search and deciding that such hypothetical "searches" are reasonable when

justified by probable cause and exigent circumstances. The approach suggested by Justices Gillette and Graber is not supported by this court's precedents, principles of judicial administration, or sound logic.

This court has a well-established methodology for deciding cases under Article I, section 9, of the Oregon Constitution. This court has long taken the approach that the threshold question in any Article I, section 9, case is whether the government activity at issue is a search or a seizure. *See, e.g., State v. Wacker*, 317 Or 419, 426, 856 P2d 1029 (1993); *State v. Ainsworth*, 310 Or 613, 616, 801 P2d 749 (1990). In *State v. Wacker, supra*, 317 Or at 426, this court stated:

> "The threshold question in any Article I, section 9, search analysis is whether the police conduct at issue is sufficiently intrusive to be classified as a search. No search occurs unless the police invade a protected privacy interest. *If the police conduct is not a search within the meaning of Article I, section 9, this court will not reach the issue of whether the conduct was unreasonable.*" (Emphasis added.)

Whether the police conduct at issue is a search is a necessary preliminary inquiry to determining whether the conduct is reasonable. Thus, the court's holding that the administration of field sobriety tests constitutes a search under Article I, section 9, is not *dictum*.

The approach taken by the court in this case also recognizes the proper position of the courts in reviewing the actions of the police, which are part of the executive branch of government. The courts are part of the judicial branch. As such, the courts have no general authority to review the reasonableness of executive action. Under the Oregon Constitution, the courts are empowered to scrutinize the "reasonableness" of a particular class of executive conduct, namely searches and seizures, to determine whether such conduct complies with Article I, section 9, of the Oregon Constitution. In other words, unless the court determines that the police activity is a search or a seizure, and therefore subject to Article I, section 9, this court has no authority to evaluate whether the action is

"reasonable."[1] The court's opinion in this case properly does not presume to review the reasonableness of the actions of a coordinate branch of government without first establishing a solid constitutional basis for such scrutiny.

Finally, the approach suggested by Justices Gillette and Graber is flawed logically. The existence of probable cause and exigent circumstances creates an exception to the general rule that a warrant is required for a *search* to be reasonable. *See State v. Paulson*, 313 Or 346, 351, 833 P2d 1278 (1992) ("[n]ormally, in order for a search to be constitutionally permissible, the police must have a search warrant"). It would make no sense to determine whether the *exception* applies without first determining that the *rule* applies. The court therefore takes the proper approach by first determining whether the administration of field sobriety tests is a search, then looking to see if the police had a warrant to justify the search, and then considering if any exception to the warrant requirement applies.

**GILLETTE, J.,** concurring in part and specially concurring in part.

I join in the lead opinion's conclusion as to the appropriate outcome of this case, but subject to the various qualifications that I shall discuss below. As will become clear from my explanations, it is not possible for me to join in much of the analysis by which the lead opinion reaches that outcome.

In spite of the fact that this opinion takes us some distance down a new road — a fitting metaphor, I think — the opinion may well be defensible, in the abstract, in the way that it applies, to the narrow range of facts that it chooses to discuss, this court's previous jurisprudence with respect to what constitutes a "search" under Article I, section 9, of the Oregon Constitution. What I find to be most striking about the lead opinion, however, is the range of issues that the lead opinion does *not* discuss and, therefore, cannot later fairly be argued as having decided.

---

[1] I do not mean to suggest that police conduct that is not a "search" or a "seizure" is immune from judicial scrutiny entirely. Rather, there is no judicial scrutiny under Article I, section 9. Any police conduct must comply with all other applicable administrative, statutory, and constitutional requirements.

I understand the lead opinion to hold that the administration of "field sobriety tests" to a driver whom a police officer reasonably suspects has been driving a motor vehicle while under the influence of intoxicants is a "search" under Article I, section 9, of the Oregon Constitution. As an application of settled principles, the foregoing proposition — while new — does no violence *in the abstract* to constitutional precepts. That is, the conclusion reached by the lead opinion appears to follow reasonably from such well-settled propositions as (1) a search is "an intrusion by a governmental officer, agent, or employee into the protected privacy interest of an individual,"[1] which intrusion (2) would "significantly impair an individual's interest in freedom from scrutiny, *i.e.*, [the individual's] privacy,"[2] and (3) the privacy interest involved is one "to which [a person] has a *right*."[3] 320 Or at 29. (That last proposition is not exactly self-explanatory, but the point is clear enough.)

To apply the foregoing concepts concretely: A person may wish to conceal, *i.e.*, to maintain as private, the person's particular state of inebriation. Some indications of that state can be gained by anyone standing in close proximity to the person. No one in this case denies that the arresting officer is entitled to perceive and use observations of that kind. But a constitutionally different situation is presented when the person is somehow required by the officer to take actions that are likely further to disclose the person's state of inebriation.[4]

As I say, the foregoing proposition can be defended abstractly, so long as other arguments and considerations are excluded from the analysis. The lead opinion excludes many

---

[1] *State v. Rhodes*, 315 Or 191, 196, 843 P2d 927 (1992).

[2] *State v. Dixson/Digby*, 307 Or 195, 211, 766 P2d 1015 (1988); *accord State v. Wacker*, 317 Or 419, 426, 856 P2d 1029 (1993).

[3] *State v. Campbell*, 306 Or 157, 164, 759 P2d 1040 (1988) (emphasis in original).

[4] In this regard, the lead opinion seems to place emphasis on the "unusual" nature of the acts that the person is required to perform — at least, that label is used at three different points in the lead opinion analysis. *See* 320 Or at 30. I am unclear as to what significance that label has, because the principled difference between "unusual" acts and "ordinary" acts escapes me if either kind of act is required by the officer and permits the officer to make observations with respect to the person's condition that the officer otherwise would be entitled to make. As I explain in the text, it may be that the more important inquiry is what justifies the lead opinion's use of verbs like "require," in the first instance.

such arguments and considerations by not acknowledging or discussing them. Thus insulated from the full range of pertinent questions, the answer given by the lead opinion stands up.

Whether it will stand up when the rest of the pertinent arguments and considerations at last receive appropriate attention in a future case remains a far more difficult question, but I am content to await that case. I note only a few of the more obvious issues that remain open:

*1. What Was the Nature of the Decision by Defendant to Take the Test?*

Beginning at the beginning, it is important to note the operative verbs by which the majority characterizes the process through which defendant was induced to take the four field sobriety tests that were involved in this case. The officer, the majority says, "directed," "directed [again]," "instructed," and "required" defendant to take the tests. 320 Or at 30. But those tests were not conducted at the point of a gun. The only force that was used by the officer to induce defendant to take the tests was that provided by the law itself.

ORS 813.135 provides:

"Any person who operates a vehicle upon premises open to the public or the highways of the state shall be deemed to have given consent to submit to field sobriety tests upon the request of a police officer for the purpose of determining if the person is under the influence of intoxicants if the police officer reasonably suspects that the person has committed the offense of driving while under the influence of intoxicants in violation of ORS 813.010 or a municipal ordinance. Before the tests are administered, the person requested to take the tests shall be informed of the consequences of refusing to take or failing to submit to the tests under ORS 813.136[, which provides for the use of such refusal as evidence in any criminal or civil action or proceeding arising out of allegations that the person was driving while under the influence of intoxicants]."

Given the authority granted to the officer by the foregoing statute, why is the majority entitled to use the verbs that it uses in beginning its "search" analysis? Those verbs import into the discussion a suggestion that defendant was denied some choice by the officer, but that is not the case. Defendant

*agreed* to take the tests, coerced to do so by the statute itself. How has the officer "intruded," as the constitutional test requires that he do if he is searching, when all that the officer observes and records is the result of an informed choice made by defendant? This argument is not considered or addressed by the lead opinion, and so remains open for exploration in a future case.

### 2. *What Precisely is the Act that Constitutes a Search?*

The concluding sentence in the lead opinion's analysis under Article I, section 9, states: "We conclude that *the administration of such tests* here *constitutes a search * * *." See* 320 Or at 31 (emphasis added). By "such tests," I presume that the majority is referring to the field sobriety tests described in such painstaking detail earlier. *See* 320 Or at 30 (describing tests taken by defendant). But — *all* of them? Collectively? Individually? Some, but not all? Specifically, would it have been a search if the officer had been content to ask only that defendant recite the alphabet backwards, and had noted the response? Had asked only that defendant count backwards? Had asked only that defendant stand on one leg? Walk a straight line, heel to toe? It would have been better if the lead opinion had been more explicit as to this point but, as already noted, the opinion is quite abstract.

The questions that I pose are not asked idly. We are tinkering with more than just a single stop of a single driver by a single officer. The field sobriety tests used in this case are derived from an administrative rule, OAR 257-25-020. That administrative rule is in turn derived from the specific authority granted by statute to police officers to request that certain persons take field sobriety tests. *See* ORS 813.135, *supra* (authorizing administration of field sobriety tests). That statute is an adjunct to Oregon's "Implied Consent Law," *see, generally,* ORS 813.100 *et seq.* To the extent that the administrative rule authorizes the officer to make the request and to administer the tests on the basis of reasonable suspicion, the constitutionality of the rule is placed in considerable doubt (as well as are the things that officers may do pursuant to it).

I assume that the lead opinion's failure to address the constitutionality of the administrative rule is a reflection

of the fact that the majority's only purpose is to place on the table the reasoning that, at least in the abstract, the idea that a field sobriety test could be a search may be well founded and should be taken seriously.

### 3. What is the Pertinence of the Fact that Driving a Motor Vehicle is an Intensively Regulated Activity?

The majority has not considered, and does not today decide, whether, *inter alia*, (1) searches of the kind involved here may be carried out with less than probable cause, because of the minimal privacy interest involved or the limited nature of the intrusion;[5] or (2) the pervasive nature of the state's regulation of the activity of driving has so reduced a person's privacy with respect to that activity that there is, in fact, no search at all under the present circumstances.[6] Much remains to be said about those issues.

One final thing needs to be said about the methodology employed by the court in this case. There is nothing compelling about the majority's justification for its expedition into the issue of what is a "search." As recently as two years ago, this court assumed the existence of a search — a somewhat difficult issue under the facts of that case — because, even assuming a search, the acts by a police officer that constituted the search were based on probable cause and exigent circumstances. *See State v. Anfield*, 313 Or 554, 561, 836 P2d 1337 (1992) (so holding). There also is perfectly respectable (and only slightly older) precedent to the contrary. *See State v. Ainsworth*, 310 Or 613, 616-19, 801 P2d 749 (1990) (focusing on whether a "search" occurred). In other words: This court had a choice of methodologies. It should have taken the *Anfield* approach, because the answer to the case on probable cause grounds alone was dispositive.

This case could have been disposed of quickly. The officer's actions that are under scrutiny in this case occurred after the officer acquired probable cause to arrest defendant. Therefore, any "search," as that concept is embodied in

---

[5] For a similar treatment of "seizures" under Article I, section 9, *see State v. Holmes*, 311 Or 400, 813 P2d 28 (1991) (upholding constitutional permissibility of certain limited kinds of stops on less than probable cause).

[6] *See State v. Ainsworth*, 310 Or 613, 616, 801 P2d 749 (1990) (aerial surveillance of private property did not invade privacy of occupants of property).

Article I, section 9, of the Oregon Constitution, that may have occurred here was justified by probable cause and exigent circumstances. That is the beginning and the end of the analysis that is *necessary* to resolve this case. The lead opinion ultimately recognizes the validity of that analysis in reaching its disposition in this case, and I join in that disposition and its rationale.

Graber, J., joins in this concurring in part and specially concurring in part opinion.

**VAN HOOMISSEN, J.,** concurring in part, specially concurring in part.

I agree with the analysis and holding announced by the majority.

I write separately to express my view that the "subjective" component of probable cause recognized (without citation of any authority) in *State v. Owens*, 302 Or 196, 204, 729 P2d 524 (1986), is not properly a requirement of probable cause under Article I, section 9, of the Oregon Constitution.[1] In my view, Article I, section 9, is satisfied when it is objectively reasonable under the circumstances for an officer to believe that a crime has been committed and, thus, that a person or thing is subject to seizure. *See State v. Cloman*, 254 Or 1, 12, 456 P2d 67 (1969) ("if the officers had probable cause to arrest, the arrest made is not rendered illegal because the officers expressed another and improper cause for arrest"); *see also* LaFave, 1 Search and Seizure § 3.2(b) at 566-68, Supp at 113 (1987 & Supp 1994) (indicating that the test should be objective, and that the cases holding that there are both objective and subjective components of probable cause, including *State v. Owens, supra*, are "not the correct view").

**GRABER, J.,** specially concurring.

I agree with the majority that the officer had probable cause to arrest defendant for driving under the influence of intoxicants, before asking him to perform field sobriety tests, that the trial court made proper and sufficient findings in that regard, and that there were exigent circumstances

---

[1] I was not a member of this court when *Owens* was decided.

when the officer administered the tests. That being so, even assuming that the field sobriety tests were a "search" or a "seizure" within the meaning of the pertinent constitutional provisions, defendant's arguments fail. I therefore concur in the judgment.

I cannot, however, join the majority's *dictum* as to whether the field sobriety tests administered to defendant were a search. The majority's discussion of that issue is immaterial to the outcome. Because there is probable cause, it matters not whether the field sobriety tests were, or were not, a search within the meaning of Article I, section 9, and the Fourth Amendment. Stated differently: as to *this* defendant, there was probable cause, so it is only a theoretical exercise to decide whether field sobriety tests could be administered constitutionally to someone else for whom there is *less than* probable cause.[1]

Before oral argument, this court submitted questions to the parties and asked for written responses. The third question was this:

"If the trial court did conclude that there was probable cause to search or seize defendant before the field sobriety tests were administered, can this court reach the question whether the statutes and rules providing for field sobriety tests violate Article I, section 9, or the Fourth Amendment by allowing a 'search' or 'seizure' on less than probable cause?" (Citation omitted.)

Both parties answered that question in the negative. Defendant responded simply:

"Assuming, but not conceding, that this court finds (contrary to defendant's argument) that the trial court *properly* found that both subjective and objective probable cause existed prior to the administration of the field sobriety tests, this would obviate the need to reach the issue of whether the field sobriety test statutes unconstitutionally allow administration of field sobriety tests on a standard less demanding than probable cause." (Emphasis in original.)

---

[1] Because the *dictum* is announced by five members of the court, I also join the separate opinion of Gillette, J., which casts doubt on the substantive correctness of what the majority states.

The state's answer was longer, but similar. It stated in part:

"Because the trial court correctly concluded that the officer had probable cause before he requested defendant to perform field sobriety tests, the issue posed by the court is not presented in this case. Whichever way this court were to rule on the lawfulness of requiring performance of field sobriety tests on less than probable cause, the outcome of this case would be the same: The Court of Appeals and trial court would be affirmed. Deciding the issue in this case would constitute nothing more than an abstract or advisory opinion. This court has refused to issue such opinions."

This court is not bound, of course, to accept the parties' answer to a legal question, even when the parties agree. *See State v. Bea*, 318 Or 220, 224, 864 P2d 854 (1993) (appellate court need not accept concession concerning legal conclusion). In this instance, however, the parties are right.

I concur specially.

Gillette, J., joins in this specially concurring opinion.