Submitted on record and briefs November 21, 1995; resubmitted In Banc March 6, reversed and remanded with instructions May 1, 1996

In the Matter of the Suspension of
the Driving Privileges of

RONALD SIDNEY WINROTH,
*Appellant,*

*v.*

DRIVER AND MOTOR VEHICLE SERVICES
Branch of the Oregon Department of
Transportation (DMV),
*Respondent.*

(CV94415; CA A88259)

915 P2d 991

J. Mark Lawrence filed the brief for appellant.

Theodore R. Kulongoski, Attorney General, Virginia L. Linder, Solicitor General, and Stephen L. Madkour, Assistant Attorney General, filed the brief for respondent.

ARMSTRONG, J.

De Muniz, J., concurring.

Edmonds, J., dissenting.

## ARMSTRONG, J.

In the early morning hours of September 27, 1994, petitioner was arrested for driving on a public highway while under the influence of intoxicants. ORS 813.010. His driving privileges were subsequently suspended pursuant to ORS 813.410 after the Department of Driver and Motor Vehicle Services (DMV) held a hearing and determined that he had been lawfully arrested and had had a chemical breath test result in excess of the level permitted by law. At the DMV hearing, petitioner argued that the arresting officer did not have probable cause to arrest him until after the officer had conducted an illegal search by administering field sobriety tests. *See State v. Nagel*, 320 Or 24, 880 P2d 451 (1994) (holding that the administration of field sobriety tests constitutes a search under the state and federal constitutions). Petitioner argued, as a consequence, that all the evidence obtained as a result of the search, including the breath test result, had to be suppressed. DMV held contrary to petitioner's position, as did the circuit court on review. We review for substantial evidence and errors of law, *Shakerin v. MVD*, 101 Or App 357, 790 P2d 1180 (1990), and reverse.

We state the facts consistent with the findings of the DMV hearings officer. On September 27, 1994, at 12:55 a.m., police officer Pulicella observed petitioner's car cross the center line of traffic and then return to its own lane. The officer followed petitioner as petitioner drove into the city of Newberg. He observed petitioner drive for three blocks at 45 miles per hour in a 25-mile-per-hour zone, at which point he stopped petitioner.

The officer asked to see petitioner's driver's license. Petitioner had difficulty finding it in his wallet, twice passing over it before handing it to the officer. The officer noticed that petitioner's eyes were bloodshot and that there was an odor of alcoholic beverage emanating from the car. The officer asked petitioner if he had been drinking; petitioner admitted to consuming two beers. At that point, the officer asked petitioner to get out of the car and perform field sobriety tests. Petitioner asked the officer what would happen if he refused the tests. The officer explained that if he refused, evidence of the

refusal could be used against him in a criminal or civil action. *See* ORS 813.130(2)(a). Thereafter, petitioner agreed to take the tests. The officer administered six different tests and then arrested petitioner.

In *State v. Nagel*, the Supreme Court held under Article I, section 9, of the Oregon Constitution that field sobriety tests constitute a search. Consequently, to conduct the tests, an officer must either have a search warrant or the search must fall into one of the recognized exceptions to the warrant requirement. 320 Or at 31. One exception to the warrant requirement is a search conducted "with probable cause and under exigent circumstances." *Id.* at 32. Under that exception, an officer must have probable cause to believe that an individual is driving under the influence of intoxicants *before* the officer administers field sobriety tests to the individual. The test for probable cause has both an objective and a subjective component. *See id.* at 32; *State v. Owens*, 302 Or 196, 204, 729 P2d 524 (1986). That means that the officer must subjectively believe that a crime has been committed, and that belief must be objectively reasonable. *Nagel*, 320 Or at 32.

At the hearing to suspend petitioner's driver's license, petitioner argued that the police officer lacked probable cause to proceed with the field sobriety tests because the officer had not formed a subjective belief that petitioner was intoxicated until after the officer had administered the tests. The hearings officer held to the contrary, finding that if petitioner had refused to perform the field sobriety tests, the officer "would have arrested petitioner for DUII." The hearings officer then concluded:

"Petitioner displayed poor driving when he crossed the center line and went back to his lane, and when he drove 45 mph in the 25-mph zone. The officer then observed that petitioner's eyes were bloodshot, there was an odor of alcohol believed to be coming from petitioner's breath, petitioner passed over his driver license twice while looking for it, and petitioner told the officer he had been drinking beer. Viewed objectively, [the officer] certainly had good reason to believe petitioner was under the influence of intoxicants. *Subjectively, if petitioner had refused to perform field sobriety tests, [the officer] would have arrested him for DUII.*"

(Emphasis supplied.)

■     The issue in this case is whether substantial evidence supports the hearings officer's finding about when the officer subjectively concluded that he had probable cause to arrest petitioner. "Substantial evidence exists to support a finding of fact when the record, *viewed as a whole*, would permit a reasonable person to make that finding." ORS 183.482(8)(c) (emphasis supplied). In that regard, the officer testified on cross-examination:

"Q.  * * * Can you tell me at what point you decided you had probable cause to arrest him?

"A.  Well, I guess technically * * * I knew that he had made mistakes on pretty much all of the tests. I personally * * * usually will go through and do at least five tests before I even make a decision. * * *

"* * * * *

"Q.  And that's what you're trained to do, but if you look at * * * the test and everything and I'm now asking you to look back with 20/20 hindsight. At what point did you have probable cause?

"A.  *After the third test.*

"* * * * *

"Q.  It was like I could arrest him now if I wanted to?

"A.  Correct. And again, in the training that I've had by the State Police, they've * * * gone through and brought up all of these tests. However, the three tests that they, you know, will stipulate on and most of the state troopers that I have talked with will do three tests. They'll do the HGN, one-leg-stand and the walk-and-turn and that's it and then they'll go ahead and make a decision from there.

"Q.  Okay. In fact you have a little formula almost. If they do certain on those tests, perform a certain way, then you'd have probable cause?

"A.  Correct."

(Emphasis supplied.)

On redirect examination, the hearings officer asked the police officer if he believed that he would have had probable cause to arrest petitioner if petitioner had refused to take the field sobriety tests. The officer responded:

"A. I—well, to be honest with you I remember specifically that evening I have never had anybody not do the field sobriety test and just say no. You know, I had no idea what his blood alcohol content was going to be. Based on his driving, you know, which technically, I mean, I guess his driving technically wasn't really all that bad, you know. I mean he crossed the center line and he was speeding. However, I've seen a lot worse than that with somebody that's had— that has been out and, you know, had a recorded [blood alcohol content] of a .125. I've seen a lot worse driving than that. * * * I specifically remember when he said, if I don't do the test. I remember running through my head, please don't say that, because— I guess, I don't know * * *.

"Q. I want to make sure that you understand my question. I'm not talking about evidence that you would have needed to make a conviction.

"* * * * *

"Q. I'm talking about whether or not you believe you would have had probable cause to arrest him [before he performed the field sobriety tests]?

"A. Well, * * * they pay me to be able to make quick decisions like that and technically, *I guess, at that time if he would have refused the field sobriety tests, then I guess I would probably [be] thinking, oh you've got something more to hide than I think you do. And because I can smell the alcohol then probably I would have arrested him at that point in time.*"

(Emphasis supplied.)

■ There is no question that the facts support an objective finding of probable cause.[1] Whether there is substantial evidence to support the hearings officer's finding depends on

---

[1] Petitioner was speeding and crossed over the center line of the road. When the officer stopped petitioner, the officer smelled a moderate odor of alcohol, saw that petitioner had bloodshot eyes and saw petitioner go by his license twice before giving it to the officer. Further, petitioner admitted to the officer that he had consumed alcohol that night.

whether a reasonable person could conclude on this record that the officer *subjectively* believed that he had probable cause to arrest petitioner before he asked petitioner to perform the field sobriety tests. *Shakerin*, 101 Or App at 360.

In *Owens*, the court explained that the test for the subjective prong of probable cause

"is not simply what a reasonable officer *could have* believed when he conducted a warrantless search or seizure, but *it is what this officer actually believed*, based upon the underlying facts of which he was cognizant, together with his own training and experience. * * * What is required is that the officer formulates such a basis to himself at the time he acts."

302 Or at 204 (emphasis in original and supplied).

The facts of this case show unequivocally that Pulicella did not "actually" believe that he had probable cause to think that petitioner was driving under the influence when he asked petitioner to perform the field sobriety tests. Pulicella testified consistently and repeatedly that he was not sure that he had probable cause until *after* petitioner had performed the tests.

Officer Pulicella testified:

"[T]he crossing of— of the center line, I guess put into my head that *there was a possibility of a * * * traffic crime*[.] * * *

"* * * * *

"* * * I told [petitioner] that *if I can smell alcohol, * * * I will run somebody through field sobriety tests* to make sure that they're all right * * *."

(Emphasis supplied.) The only reasonable meaning of that testimony is that, before administering the tests, Pulicella only suspected that *it was possible* that petitioner was driving under the influence of intoxicants. It is evident from that testimony that Pulicella commonly asked individuals to perform field sobriety tests whenever he could smell alcohol, in order to allay his suspicion that they were violating the law. Such an attitude is not surprising, given that the Oregon Supreme Court had issued its opinion in *Nagel* fewer than

three weeks before the stop. It was not known before *Nagel* that an officer had to have probable cause *before* asking a person to perform field sobriety tests. So it is understandable that Pulicella did not think that he did.

The dissent insists that the hearings officer could conclude that Pulicella believed that he had probable cause to arrest petitioner before asking him to perform field sobriety tests. It bases its belief on the fact that Pulicella testified that, if petitioner had refused to perform the tests, Pulicella would have thought that petitioner had "something more to hide" and Pulicella "probably would have arrested him." As it turned out, however, Pulicella was not called on to make a decision about the existence of probable cause before he administered the tests, because petitioner agreed to perform them. Thus, Pulicella did not think that petitioner had "something more to hide" and, hence, did not conclude that petitioner was intoxicated before he administered the tests.

As the court explained in *Owens*, the test for the subjective prong of probable cause does not focus on what the officer could have believed when he conducted the warrantless search. Rather, to satisfy the test, the officer must consciously decide that he has probable cause to conduct the search *before* he conducts it. *Owens*, 302 Or at 204. Pulicella did not do that before he conducted the field sobriety tests, because he did not know that he had to. It is irrelevant what Pulicella could have believed under a different set of circumstances, that is, if petitioner had refused the tests. *Id.* Consequently, the testimony on which the dissent relies is not evidence that could support a finding that Pulicella believed that he had probable cause to arrest petitioner before he conducted the field sobriety tests.

Pulicella testified that, after the first test, the HGN test, he still had not actually made a decision about whether he was going to arrest petitioner. In fact, Pulicella had petitioner perform *six* field sobriety tests before he decided that he had probable cause to make the arrest. Pulicella also testified that, in retrospect, he believed that he had probable cause after the third test. Under *Nagel* and *Owens*, his decision came too late. Because the search was conducted without probable cause, the evidence obtained as a result of the field sobriety tests should have been suppressed.

Reversed and remanded with instructions to remand to the Department for reconsideration.

**DE MUNIZ, J.,** concurring.

I agree with the majority that Officer Pulicella did not subjectively believe that he had probable cause to arrest petitioner for DUII before administering the field sobriety tests. I write separately only to point out how recent cases have dramatically altered the investigation of DUII offenses.

Although the majority and dissent are fighting over what appears to be an overly fine point, recent cases have reduced the law of DUII to just such narrow issues. In the light of *State v. Nagel*, 320 Or 24, 880 P2d 451 (1994), and *State v. Fish*, 321 Or 48, 893 P2d 1023 (1995), Oregon courts increasingly will be required to focus on such apparently insignificant, but ultimately dispositive issues, and fights over the minutae will become commonplace.

Traditionally, the only limit on an officer's ability to request and observe field sobriety tests was whether the officer had reasonable suspicion of DUII sufficient to detain the driver. *State v. Niles*, 74 Or App 383, 387, 703 P2d 1030 (1985). There was no probable cause requirement because administering sobriety tests was not considered a "search" under Article I, section 9, of the Oregon Constitution. *Id.* at 386-87.[1] However, in *Nagel*, the Supreme Court held that field sobriety tests constitute a search,[2] which must be supported by probable cause.[3] 320 Or 31-32. Because probable

---

[1] This court did not consider field sobriety tests a search under Article I, section 9, because they did not involve "a forbidden intrusion of the defendant's person * * * [nor] a probing into defendant's private life or thoughts," and drivers at that time were not legally obligated to perform the tests. *Niles*, 74 Or App at 386-87. In *State v. Lawrence*, 117 Or App 99, 843 P2d 488 (1992), *affirmed* 320 Or 107, 880 P2d 431 (1994), we held that enactment of ORS 813.135, which requires all drivers to submit to field sobriety tests when there is reasonable suspicion of DUII, did not "alter our conclusion that the non-intrusive procedure of field sobriety tests does not constitute a search" under the Oregon Constitution. *Id.* at 102-03.

[2] Government conduct is a "search" under Article I, section 9, when it " ' "significantly impair[s] an individual's interest in freedom from scrutiny, *i.e.,* his privacy." ' " *Nagel*, 320 Or at 29, citing *State v. Wacker*, 317 Or 419, 425, 856 P2d 1029 (1993), and *State v. Dixon/Digby*, 307 Or 195, 211, 766 P2d 1015 (1988). Field sobriety tests are now considered searches because the police use them to create "a situation in which [the police can] observe certain aspects of the defendant's physical and psychological condition that [they are] otherwise unable to observe." *Nagel*, 320 Or at 31.

[3] In its "reasonableness" analysis, the court in *Nagel* relied solely on the "probable cause/exigent circumstances" exception to the warrant requirement. 320 Or at

cause has both an objective and subjective component, *see State v. Owens*, 302 Or 196, 204, 729 P2d 524 (1986), an officer cannot request field sobriety tests unless he *personally believes* at that time that he has probable cause to arrest the driver for DUII, regardless of whether a court in hindsight finds that probable cause was present. *Nagel*, 320 Or at 32. Hence the fine-line of disagreement between the majority and dissent.

Another facet to this problem, though not an issue in this case, is how the police may request field sobriety tests, and what, if any, information they must impart to the driver. In 1989, the Oregon Legislature added ORS 813.135 and ORS 813.136[4] to the "Implied Consent Law." ORS 813.135 provides:

> "Any person who operates a vehicle upon premises open to the public or the highways of the state shall be deemed to have given consent to submit to field sobriety tests upon the request of a police officer for the purpose of determining if the person is under the influence of intoxicants if the police officer reasonably suspects that the person has committed the offense of driving while under the influence of intoxicants in violation of ORS 813.010 or a municipal ordinance. *Before the tests are administered, the person requested to take the tests shall be informed of the consequences of refusing to take or failing to submit to the tests under ORS 813.136.*" (Emphasis supplied.)

ORS 813.136 provides:

---

31-32. The court did not consider a "consent" exception, even though ORS 813.135 mandates that all drivers on Oregon roads have impliedly consented to field sobriety tests. However, unlike the typical consent search, "implied consent" under ORS 813.135 only grants "legal" consent and not actual "physical" consent, *i.e.*, doing the act necessary to permit the search.

[4] ORS 813.135 and ORS 813.136 were passed in response to *State v. Greene*, 68 Or App 518, 684 P2d 575, *rev den* 297 Or 601 (1984), *overruled on other grounds State v. Panichello*, 71 Or App 519, 692 P2d 720 (1984), in which we held that using a defendant's refusal to perform field sobriety tests against him in court violated the right against compelled self-incrimination under Article I, section 12, of the Oregon Constitution. *Id.* at 526. In *Greene*, we reasoned that *refusing* field sobriety tests was "communicative" and "testimonial" and that the law at that time did not otherwise legally require drivers to submit to field sobriety tests. *Id.* at 522, 525-26. By enacting those statutes, the legislature legally required drivers to take those tests and extended to them the doctrine of implied consent, which was already the basis for admitting "breathalyzer" test results. *State v. Scott*, 111 Or App 308, 312 n 4, 826 P2d 71 (1992).

"If a person refuses or fails to submit to field sobriety tests as required by ORS 813.135, evidence of the person's refusal or failure to submit is admissible in any criminal or civil action or proceeding arising out of allegations that the person was driving while under the influence of intoxicants."

ORS 813.135, on its face, requires the police to inform drivers of the evidentiary consequences of refusing to perform field sobriety tests. However, the Supreme Court, in *State v. Trenary*, 316 Or 172, 850 P2d 356 (1993), held that the failure to inform does not make test results inadmissible, as long as the defendant voluntarily complies with the officer's request. *Id.* at 177-79.[5] Only when a driver refuses to perform the tests, the court concluded, would the failure to advise warrant suppression of the driver's refusal. *Id.* at 177-78.

Because there are no adverse consequences to violating ORS 813.135, officers have no incentive before requesting a sobriety test to advise motorists of the statutory consequences of refusing, or even that they have the option of doing so. It is only when a driver has refused that an officer would be motivated to comply with ORS 813.135, because, under *Trenary*, only then is the state subject to a suppression penalty.[6] However, in the light of the Supreme Court's decision in *Fish*, 321 Or 48, it is now doubtful whether it is lawful for the police to advise a driver of the statutory consequences of refusing a field sobriety test.

In *Fish*, the Supreme Court held that admitting into evidence a defendant's refusal to submit to field sobriety tests violates the right against compelled self-incrimination under Article I, section 12.[7] *Id.* at 60-61. As I understand *Fish*, if a

---

[5] The court in *Trenary* reasoned that ORS 813.135 and ORS 813.136 were not intended to protect citizens from illegal government conduct, but rather were designed to compel drivers to submit to field sobriety tests. 316 Or at 177-78. The statutes were aimed at forcing drivers who *refused* to perform the tests, and were not designed to create a suppression right for those who complied. *Id.* at 177.

[6] *See also State v. Fish*, 321 Or 48, 51-53, 893 P2d 1023 (1995) (officer's warning sufficient to advise defendant of consequences of refusing test under ORS 813.136, and defendant's refusal therefore admissible under statute).

[7] Article I, section 12, provides, in part:

"No person shall be * * * compelled in any criminal prosecution to testify against himself."

defendant's refusal cannot constitutionally be used as evidence against him, then the police cannot inform him of those consequences in requesting that he perform the tests. Therefore, after *Trenary*, not only do the police have no incentive to advise compliant drivers of the consequences of refusing under ORS 813.136, but, after *Fish*, they are apparently no longer *allowed* to, regardless of the driver's disposition.

The ramifications of *Fish* do not stop there. Read in conjunction with *Nagel*, *Fish* may also interject the requirement of *Miranda* warnings into field sobriety tests. Under Article I, section 12, *Miranda*-type warnings are required when a defendant is interrogated in "full custody" or in a "setting which judges would and officers should recognize to be 'compelling.' " *State v. Smith*, 310 Or 1, 7, 791 P2d 836 (1990); *State v. Mourlas*, 120 Or App 19, 22, 852 P2d 268, *rev den* 317 Or 272 (1993). This court has consistently indicated that *Miranda* warnings are not required before administering field sobriety tests, partly because such tests are not interrogation designed to elicit incriminating "testimonial" responses, but are intended only to gather "demonstrative" physical evidence. *State v. Whitehead*, 121 Or App 619, 623, 855 P2d 1149 (1993); *State v. Lawrence*, 117 Or App 99, 104, 843 P2d 488 (1992), *affirmed* 320 Or 107, 880 P2d 431 (1994); *State v. Scott*, 111 Or App 308, 312, 826 P2d 71 (1992); *State v. Wells*, 58 Or App 617, 621, 650 P2d 117 (1982), *rev den* 295 Or 446 (1983); *State v. Medenbach*, 48 Or App 133, 138-39, 616 P2d 543 (1980).

However, as part of its Article I, section 12, analysis, the majority in *Fish* concluded as a matter of law that some of the field sobriety tests authorized by OAR 257-25-020(1) are "testimonial" because "they require the individual to communicate information to the police about the individual's beliefs, knowledge, or state of mind." 321 Or at 60. As examples, the court cited tests involving counting, OAR 257-25-020(1)(b), (1)(f), (1)(h);[8] answering questions relating to the

---

[8] Although the *Fish* majority did not include the "one-leg stand test," OAR 257-25-020(1)(c), that test also involves "counting" and would probably be deemed testimonial.

individual's residence and date of birth, OAR 257-25-020(1)(d)(B); estimating a period of time, OAR 257-25-020(1)(i); and reciting the alphabet, OAR 257-25-020(1)(g). *Id.*

Interrogation alone, however, does not require *Miranda* warnings; interrogation must also be "custodial" or take place in otherwise "compelling circumstances." *Smith*, 310 Or at 7; *Mourlas*, 120 Or App at 22. It is unclear, under current case law, whether field sobriety tests constitute such a circumstance. Although the Supreme Court in *Nagel* held that administering field sobriety tests is a "search," it did not also say they amount to a "seizure" of the person. Indeed, in *State v. Campbell*, 306 Or 157, 759 P2d 1040 (1988), placing an electronic tracking device on a suspect's vehicle was a "search," 306 Or at 172, although it clearly did not involve a seizure of the suspect's person.

Furthermore, we have held that the setting in which field sobriety tests are requested and performed generally does not constitute inherently "compelling circumstances." *State v. Schaffer*, 114 Or App 328, 332-33, 835 P2d 134 (1992); *State v. Gainer*, 70 Or App 199, 203, 689 P2d 323 (1984). However, there is no bright line rule as to when circumstances are "compelling" for *Miranda* purposes under the Oregon Constitution.[9] Rather, whether an individual is subject to the equivalent of "full custody" generally depends on the facts and circumstances of each case. *Smith*, 310 Or at 7-8; *State v. Magee*, 304 Or 261, 265-66, 744 P2d 250 (1987); *State v. Tobias*, 131 Or App 591, 594, 887 P2d 366 (1994); *State v. Widerstrom*, 109 Or App 18, 21-23, 818 P2d 934, *rev den* 312 Or 526 (1991); *State v. Greason*, 106 Or App 529, 533, 809 P2d 695, *rev den* 311 Or 643 (1991); *State v. Walker*, 104 Or App 410, 416-17, 801 P2d 877 (1990), *rev den* 311 Or 187 (1991). It is an open question whether that determination is affected by the Supreme Court's characterization of field sobriety tests as a "search."

---

[9] I question our conclusory statements in *State v. Prickett*, 136 Or App 559, 565, 902 P2d 621 (1995), *rev allowed* 322 Or 489 (1996), and *Lawrence*, 117 Or App at 104, that the setting becomes compelling "once the [field sobriety] tests have concluded." As discussed below, whether a setting is compelling depends on the facts and circumstances of the individual case.

It appears, therefore, depending on the underlying custodial circumstances, that the police may be required to issue *Miranda* warnings before administering any sobriety tests that "draw upon the individual's memory, perception, and ability to communicate, *i.e.*, his or her testimonial capacity." *Fish*, 321 Or at 60. Apparently, it is only purely demonstrative tests of physical reaction and dexterity, such as the horizontal gaze nystagmus test (HGN), OAR 257-25-020(1)(a), and the finger-to-nose test, OAR 257-25-020(1)(e), that the police may administer without *Miranda* warnings, regardless of whether circumstances are otherwise compelling.

This is a far cry from the not-so-distant DUII case law that characterized field sobriety tests as mere investigation requiring none of the protections outlined above. Today, not only must the police subjectively believe that they have probable cause to arrest for DUII before requesting sobriety tests, but they can apparently no longer advise of the consequences of refusing (which are unconstitutional) and instead, depending on the individual circumstances, may have to issue *Miranda* warnings before administering any test involving memory, perception or communication.

**EDMONDS, J.,** dissenting.

I dissent, because I believe that the hearings officer's finding that the officer had subjective probable cause to arrest petitioner before he administered the field sobriety tests is supported by substantial evidence. "Substantial evidence exists to support a finding of fact when the record, viewed as a whole, would permit a reasonable person to make that finding." ORS 183.482(8)(c). In that regard, the officer testified on cross-examination:

"Q.   * * * Can you tell me at what point you decided you had probable cause to arrest him?

"A.   Well, I guess technically * * * I knew that he had made mistakes on pretty much all of the tests. I personally * * * will go through and do at least five tests before I even make a decision.

"* * * * *

"Q. And that's what you're trained to do, but if you look at * * * the test and everything and I'm now asking you to look back with 20/20 hindsight. At what point did you have probable cause?

"A. After the third test.

"* * * * *

"Q. It was like I could arrest him now if I wanted to?

"A. Correct. And again, in the training that I've had by the State Police, they've * * * gone through and brought up all of these tests. However, the three tests that they, you know, will stipulate on and most of the state troopers that I have talked with will do three tests. They'll do the HGN, one-leg-stand and the walk-and-turn and that's it and then they'll go ahead and make a decision from there.

"Q. Okay. In fact you have a little formula almost. If they do certain on those tests, perform a certain way, then you'd have probable cause?

"A. Correct."

On redirect examination, the prosecutor asked the officer if he believed he would have had probable cause to arrest petitioner if petitioner had refused to take the field sobriety tests. The officer responded:

"A. I— well, to be honest with you I remember specifically that evening I have never had anybody not do the field sobriety test and just say no. You know, I had no idea what his blood alcohol content was going to be. Based on his driving, you know, which technically, I mean, I guess his driving technically wasn't really all that bad, you know. I mean he crossed the center line and he was speeding. However, I've seen a lot worse than that with somebody that's had— that has been out and, you know, had a recorded [blood alcohol content] of a .125. I've seen a lot worse driving than that. * * * I specifically remember when he said, if I don't do the test. I remember running through my head, please don't say that, because— I guess, I don't know * * *.

"Q. I want to make sure that you understand my question. I'm not talking about evidence that you would have needed to make a conviction.

"* * * * *

"Q. *I'm talking about whether or not you believe you would have had probable cause to arrest him at that point?*

"A. Well, * * * they pay me to be able to make quick decision[s] like that and technically, I guess, at that time if he would have refused the field sobriety tests, then I guess I would probably [be] thinking, oh you've got something more to hide than I think you do.[1] *And because I can smell the alcohol* then I probably would have arrested him at that point in time." (Emphasis supplied.)

Whether there is substantial evidence to support the hearings officer's finding depends on whether a reasonable person could have concluded on this record that the officer subjectively believed he had probable cause to arrest petitioner before he asked petitioner to perform field sobriety tests. *Shakerin v. MVD*, 101 Or App 357, 360, 790 P2d 1180 (1990). In the light of the officer's other observations, his testimony on redirect examination expresses a subjective belief by the officer that he reasonably believed petitioner to be perceptibly affected by the alcohol petitioner admitted consuming. Pulicella testified that he observed petitioner's car cross the center line of traffic and then return back to its own lane. The officer then followed petitioner as he drove into the city of Newberg. He observed petitioner drive for three blocks at 45 miles per hour in a 25-mile-per-hour zone, at which point the officer stopped him. The officer asked to see petitioner's driver's license. Petitioner had difficulty finding it in his wallet, twice passing over the license before handing it to the officer. The officer noticed that petitioner's eyes were bloodshot and that there was an odor of alcoholic beverage emanating from the car. The officer asked petitioner if he had been drinking, and petitioner admitted to consuming two beers. At that point, the officer asked petitioner to get out of the car and perform field sobriety tests.

---

[1] In his brief, petitioner says:

"It is of no legal consequence that the officer testified that if he had to arrest Petitioner without [the] benefit of [field sobriety tests], he would have based [the arrest] upon the thinking [that] Petitioner had something 'to hide.' "

As I understand that statement, it means that petitioner does not challenge the rationale for the officer's subjective belief, nor is that necessarily a proper inquiry. *See State v. Cloman*, 254 Or 1, 12, 456 P2d 67 (1969).

Apparently, the majority maintains that a reasonable factfinder could not have made the hearings officer's finding. In other words, the majority holds that there is *no* evidence in the record to support the hearings officer's finding that the arresting officer had subjective probable cause to arrest petitioner before he administered the field sobriety tests. It concedes that "there is no question that the facts support an objective finding of probable cause," 140 Or App at 627, but concludes from the evidence that "[t]he facts of this case show unequivocally that Pulicella did not 'actually believe' that he had probable cause to think petitioner was driving under the influence when he asked petitioner to perform the field sobriety tests." 140 Or App 628. According to the majority, Pulicella testified only that "it was possible" that petitioner was driving under the influence of intoxicants. 140 Or App 628.

That reasoning demonstrates that the majority is conducting an inappropriate *de novo* standard of review. The question put to the officer on redirect examination specifically asked him to answer in retrospect whether he "believed" that he had "probable cause" to arrest petitioner before he asked petitioner to take the field sobriety tests. The appropriateness of the question and the answer is supported by the Oregon Supreme Court's holding in *State v. Nagel*, 320 Or 24, 32, 880 P2d 451 (1994). In *Nagel*, as in this case, the officer testified that he would have arrested defendant for DUII even if he had not submitted to the field sobriety tests. In *Nagel*, the officer never had to make that decision, because the defendant agreed to take the tests. Nevertheless, the court held that the officer's testimony was sufficient to establish the subjective prong of probable cause.

Additionally, the majority's literal application of the quoted language in *State v. Owens*, 302 Or 196, 204, 729 P2d 524 (1986), to the facts in *Nagel* and to the facts in this case would require an investigating officer to articulate in his or her mind at each step of the investigation, when he or she had probable cause to arrest. In real life, as the officer testified, officers are taught to exhaust all investigative techniques before they make the decision to arrest. That policy works in favor of the accused as well as law enforcement and ought not to be discarded in an hyper-technical application of

the language in *Owens*, which does not deal with the question of what evidence will support a finding of subjective probable cause.

In sum, the hearings officer was entitled to draw all reasonable inferences from the evidence and if the inference that he drew is reasonable in the light of the evidence, we are not to substitute our judgment and draw a different inference. *City of Roseburg v. Roseburg City Firefighters, Local No. 1489*, 292 Or 266, 271, 639 P2d 90 (1981). The police officer testified that because he could smell the alcohol, he would have probably "arrested him at that point in time." Based on that testimony, and the testimony about the other observations that the officer had made about petitioner before he asked him to take the field sobriety tests, the hearings officer was entitled to infer that "that point in time" was before the officer administered the field sobriety tests. The majority errs in concluding that there is not substantial evidence to support the hearings officer's finding that the officer had subjective probable cause to arrest petitioner for DUII before he administered the field sobriety tests.

Accordingly, I dissent.

Judges Richardson, Warren and Riggs join in this dissent.